Decided 16 July, 1900.

## STATE v. TUCKER.

[ 61 Pac. 894.]

1. DUE PROCESS OF LAW—NECESSITY OF INDICTMENT.—The expression "due process of law," as used in the Fourteenth Amendment to the Constitution of the United States, refers to the right of a fair and regular trial, and not to the manner of preferring a charge of crime; so that an accusation by a public officer without the intervention of a grand jury is not in violation of said amendment.

2. NECESSITY OF GRAND JURY—ACCUSATION BY INFORMATION.—The act permitting district attorneys to file informations charging crimes in place of presentments by grand juries (Laws, 1899, p. 99), is not obnoxious to the Constitution of Oregon, Article VII, § 18, authorizing the legislature to modify or abolish grand juries.

3. SUFFICIENCY OF EVIDENCE—MOTION TO ACQUIT.—Defendant lived about two miles from the granary from which two sacks of alfalfa seed were taken.  The

locks on the granary door had been broken with a punch secured from a shed, to and from which boot tracks were traced, similar to tracks found between the granary and a barnyard gate from which tracks of two horses were traced through a field to a road and to a gate near where defendant lived. In the course of the horses' tracks, a letter was found, addressed to defendant, and similar boot tracks were found at the outlet from the field to the road. A witness testified that shortly thereafter defendant and another tried to sell him alfalfa seed, while another witness testified that, three days after the taking, defendant and such other sold him two sacks of alfalfa seed of the same character as that taken, the sacks being identified as those stolen. *Held.* that it was not error to refuse an instruction to acquit, since the testimony was sufficient to justify an inference of guilt.

4. LIABILITY OF JOINT CONSPIRATORS.—Where it is shown that two or more defendants were acting together for a common purpose, the act of one in pursuance of the general plan is the act of all, and they may be prosecuted either jointly or severally therefor.

5. INSTRUCTIONS GIVEN IN GENERAL CHARGE.—It is not error to refuse an instruction given in effect in the general charge.

From Union :  ROBERT EAKIN, Judge:

Harry Tucker, not being satisfied with a conviction for burglary, appeals.                                AFFIRMED.

For appellant there was a brief and an oral argument by Messrs. *Thos. H. Crawford* and *J. Marion Carroll.*

For the state there was a brief and an oral argument by Messrs. *D. R. N. Blackburn,* Attorney-General, *Samuel White,* District Attorney, and *John McCourt.*

MR. JUSTICE WOLVERTON delivered the opinion.

1.   The defendant Harry Tucker was accused, by an information filed by the district attorney, of the crime of "burglary, not in a dwelling house," jointly with one Wilbur Fruit, and, upon conviction thereof, judgment was entered against him, from which he appeals.   He complains that he was unlawfully accused, and therefore not duly convicted.   This is based upon the contention that the act of the legislative assembly of February 17, 1899 (Laws, 1899, p. 99), is in violation of the Oregon Constitution, Article VII, § 18, which involves, also, the inquiry whether he has not been deprived of the privileges

and immunities vouchsafed to every citizen of the land by the fourteenth amendment to the federal constitution, whereby it is declared that no state shall deprive any person of life, liberty, or property without due process of law. The inquiry has received consideration at the hands of the Supreme Court of the United States, and has been decided adversely to the defendant's position. The question came up in the case of *Hurtado* v. *California*, 110 U. S. 516 (4 Sup. Ct. 111), which involved the validity of a statute of California wherein it was made the duty of the district attorney, whenever a defendant was examined and committed as provided by the criminal code of that state, to file within thirty days thereafter in the superior court of the county an information charging the defendant with such offense ; and it was distinctly announced, as a principle under the constitution, that the phrase "due process of law," as used in the amendment, "refers to that law of the land in each state which derives its authority from the inherent and reserved powers of the state, exerted within the limits of those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions, and the greatest security for which resides in the right of the people to make their own laws and alter them at their pleasure." And further : " That any legal proceeding enforced by public authority, whether sanctioned by age and custom, or newly devised in the discretion of the legislative power, in furtherance of the general public good, which regards and preserves these principles of liberty and justice, must be held to be due process of law." From these premises it was concluded that although the grand jury was a tribunal known to and sanctioned by the common law, whose duty it was to make presentment of crime to the court, yet the preservation of the system was not essential to the perpetuation of those underlying principles of our civil and political

institutions; that it constituted a preliminary proceeding, formal in character only, which could result in no final judgment, except as a consequence of a regular judicial trial; and that, as the defendant was yet entitled to all the rights and privileges of a regular trial subsequently to be had, the guaranty of the constitution had been amply conserved. This case has been subsequently cited by the same tribunal as authoritative, and has never, as we are aware, been departed from. See *In re Kemmler*, 136 U. S. 436 (10 Sup. Ct. 930); *Hallinger* v. *Davis*, 146 U. S. 314 (13 Sup. Ct. 105); *McNulty* v. *California*, 149 U. S. 645 (13 Sup. Ct. 959).

The significant trend of judicial utterance of the state courts is to the same purpose. Perhaps the leading case is *Rowan* v. *State*, 30 Wis. 129 (11 Am. Rep. 559). The facts upon which it is founded illustrate very clearly the situation attending the present controversy. Originally it was declared by Section 8, Article I, of the Constitution of Wisconsin, that "no person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury." In 1870 the clause was amended so as to read: "No person shall be held to answer for a criminal offense without due process of law." The contention was that the amendment did not change the effect of the original clause, and that by the words "due process of law" there was still reserved the right to require an accusation by a lawfully constituted grand jury before the offender could be put upon his trial. Mr. Justice COLE, who announced the opinion of the court, considered the question in connection with the fourteenth amendment of the federal constitution, and his cogent reasoning, although addressed more particularly to the bearing of the amendment, was intended to apply as well to the later declaration in the state constitution. He says: "The historical origin of the Four-

teenth Amendment to the Constitution of the United States is familiar to all persons in this country. Prior to its adoption there was a class of persons in the states, which, on account of the state of public sentiment, were particularly exposed to oppressive and unfriendly local legislation. They were liable to be despoiled of their property, or to be deprived of their rights, privileges, and immunities, in an arbitrary manner, and without 'due process of law.' And the object of this amendment was to protect this class especially from any arbitrary exercise of the powers of the state governments, and to secure for it equal and impartial justice in the administration of the law, civil and criminal. But its design was not to confine the states to a particular mode of procedure in judicial proceedings and prohibit them from prosecuting for felonies by information, instead of by indictment, if they chose to abolish the grand jury system. And the words 'due process of law,' in this amendment, do not mean and have not the effect to limit the powers of the state governments to prosecution for crimes by indictments, but these words do mean law in its regular course of administration according to the prescribed forms and in accordance with the general rules for the protection of individual rights. Administration and remedial proceedings must change from time to time with the advancement of legal science and the progress of society, and, if the people of the state find it wise and expedient to abolish the grand jury and prosecute all crimes by information, there is nothing in our state constitution as it now stands, and nothing in the Fourteenth Amendment to the Constitution of the United States, which prevents them from doing so." So it was concluded that "due process of law" did not require the preservation and perpetuation of the grand-jury system, and that its abolishment was not an infraction of the sacred and inestimable rights,

privileges, and immunities to which every citizen of the state or of the United States is entitled as of right. See, also, *In re Dolph*, 17 Colo. 35 (28 Pac. 470); *In re Wright*, 3 Wyo. 748 (31 Am. St. Rep. 94, 27 Pac. 565, 13 L. R. A. 748); *In re Boulter*, 5 Wyo. 329 (40 Pac. 529); *Bolln* v. *State*, 51 Neb. 581 (71 N. W. 444); *State* v. *Sureties of Krohne*, 4 Wyo. 347 (34 Pac. 3); *State* v. *Barnett*, 3 Kan. 250 (87 Am. Dec. 471); *State* v. *Boswell*, 104 Ind. 541 (4 N. E. 675).

The history and development of the grand-jury system will demonstrate that its functions have not been uniform ;. that, while it is a body of very ancient origin, and has become inwrought as one of the permanent institutions of the common law, its offices were not always the same. At first it was a body which not only accused, but tried, public offenders. At a later period it became an informing and accusing tribunal only, without whose previous action no person charged with a felony could, except in special instances, be put upon trial. At times it stood in the country of its birth as a barrier against prosecution in the name of the sovereign, but at length it came to be regarded as an institution by which the subject was rendered sacred against oppression from unfounded prosecutions of the crown. "The institution," says Mr. Justice FIELD, "was adopted in this country, and is continued, from considerations similar to those which give to it its chief value in England, and is designed as a means not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it comes from government, or be prompted by partisan passion or private enmity :" *Grand Jury, Mr. Justice Field's Charge*, 2 Sawy. 667 (Fed. Cas. No. 18,255). The insertion of the clause in the federal constitution expressly providing for a continuation of the grand-jury system in national juris-

prudence is ascribed to such reasoning as this. The learned justice was still upon the bench, however, when the *Hurtado Case* was decided, and gave his unqualified assent to the doctrine thereof. It is evident, therefore, that, while the great jurist commended the wisdom of the system as adopted in the national constitution, he did not deem its perpetuation essential to the regular and orderly administration of justice in obedience to the behests and requirements of the "law of the land" or "due process of law." The grand jury continues to be an accusing body, but the number of which it may be composed varies in the several states. Its sittings and deliberations are in secret, and usually *ex parte;* hence lacking even the primary essentials of due process of law—the right of notice or a day in court. But this right is reserved to the accused upon his final trial by a jury of his peers.

2. The greater stress, however, is laid upon the question primarily stated—whether the legislature of the state is empowered, under the state constitution, to modify the grand-jury system, without abolishing it *in toto.* Article VII, § 18, by which the matter is regulated, reads as follows: "The legislative assembly shall so provide that the most competent of the permanent citizens of the county shall be chosen for jurors; and out of the whole number in attendance at the court, seven shall be chosen by lot as grand jurors, five of whom must concur to find an indictment. But the legislative assembly may modify or abolish grand juries." The act complained of provides, among other things, that it shall be lawful for the district attorney of any judicial district in the state, and it is made his duty, to file in the proper circuit court an information charging any person or persons with the commission of any crime defined and made punishable by the laws of the state, and which shall have been committed in the county where the information is filed; that the informa-

tion shall be substantially in the form prescribed in section 1269 of the criminal code, except the words "district attorney" shall be used instead of the words "grand jury" wherever the same shall occur, and the manner of stating the act constituting the crime shall be of like nature as required in the indictment. The act further provides that from the time the information is filed, and thereafter until and including judgment, it shall be construed to be in all respects an indictment, within the meaning of the present statutes of the state, and that the same proceedings shall be had, with like effect, as in cases where indictments are returned by a grand jury. It empowers the district attorney to subpœna witnesses to appear before him to testify concerning the commission of crime in like manner as before a grand jury, and requires the name of each witness examined under oath or affirmation to be inserted at the foot of the information, or indorsed thereon, before the same is filed ; otherwise, the testimony of such witnesses cannot be heard against the defendant at the trial. Section 7 provides, "This act shall not prevent the circuit court from convening a grand jury whenever in its opinion it is deemed advisable to do so." It is insisted that, so long as grand juries are not abolished, it is the constitutional right of every individual charged with crime to demand and require that the accusation against him be by indictment of a grand jury.

In support of this position the chief reliance is founded on the case of *In re Lowrie*, 8 Colo. 499 ( 54 Am. Rep. 558, 9 Pac. 489). That case involved the question of the constitutionality of an act of the legislature which provides, among other things, for the organization and maintenance of criminal courts within certain counties, which were to be courts of record ; and it was further provided that the district attorney of the judicial district in which they were established should be the prosecuting

officer thereof, that no grand jury should be summoned therein, but that the prosecution of all offenses should be by information, signed and verified by the district attorney, and filed therein. An information was filed against Lowrie, charging him with grand larceny under the statute, which he moved to quash upon the ground that a person charged with such an offense could only be prosecuted upon a presentment or indictment of the grand jury. The question presented had a twofold aspect or bearing, and was whether, in view of the constitution then prevailing, it was competent for the legislature to abolish the grand-jury system as it pertained to the criminal courts, and leave it in force in the district courts, which were in the exercise of general jurisdiction, or whether the system could be abolished within the territory in which the criminal courts happened to be established, and continued in force in other portions of the state, within the limitations of the federal and state constitutions. The fourteenth amendment of the federal constitution was alluded to, as were, also, Sections 8, 23, and 25 of Article II, and Section 28, Article VI, of the Colorado Constitution. Section 8 provides "that until otherwise provided by law no person shall for a felony be proceeded against criminally otherwise than by indictment;" section 23, among other things, that "hereafter a grand jury shall consist of twelve men, nine of whom concurring may find an indictment; *provided*, the general assembly may change, regulate or abolish the grand jury system;" and section 25, no person shall be deprived "of life, liberty or property without due process of law." The court entertained the view, and so decided, that under these fundamental provisions it was competent for the legislature to change, regulate, or abolish grand juries, but that in view of Section 28, Article VI, providing for uniform operation of the laws regulating courts, it must be so effect-

uated as to affect the whole community equally in respect
to the same rights and immunities under similar circum-
stances ; that is to say, it might abolish the entire sys-
tem, or it might change it ; but that whatever is done,
in either event, must be so done as to operate uniformly
over the entire state, and affect all classes of individuals
alike, or otherwise many persons within the state may be
deprived of the equal protection of the laws.   Hence it
was declared that the law providing for the prosecution
of persons charged with a felony by information within
certain prescribed portions of the state, and within cer-
tain courts of limited and peculiar jurisdiction, was un-
constitutional and therefore void.   The doctrine of the
case would seem to be, not, as contended for by counsel,
that the legislature must abolish *in toto*, or keep its hands
off, but that whatever it does towards its abolishment,
regulation, or change, the law promulgated for the pur-
pose must have equal and uniform operation throughout
the state.   Such has been the interpretation thereof as
distinguished in *Re Dolph*, 17 Colo. 35 (28 Pac. 470)—a
later case from the same state, wherein it was held that
"general laws providing for indictments and information
as concurrent remedies for the prosecution of criminal
offenses throughout the state are not unconstitutional,
when surrounded by proper regulations and safeguards,
and made applicable to all persons and communities in
the state, without discrimination."   The above quotation
is from the syllabus of the case.   The doctrine as thus
stated is supported by ample authority.   See *In re Wright*,
3 Wyo. 748 (13 L. R. A. 748, 31 Am. St. Rep. 94, 27 Pac.
565) ; *In re Boulter*, 5 Wyo. 329 (40 Pac. 529) .

The legislature by the late act has made prosecution by
information concurrent with prosecution by indictment,
which it was empowered to do by the authority vested in
it under the constitution to "modify grand juries."   The

significance of the word "modify," as used in this section, was determined in *State* v. *Lawrence*, 12 Or. 297 (7 Pac. 116). Mr. Justice LORD, speaking for the court, says : "In a general sense, to 'modify' means to change or vary, to qualify or reduce ; and unless there is something in the context, or special usage, the words are to be taken in their plain, ordinary, and popular sense. A power given to modify or abolish implies the existence of the subject-matter to be modified or abolished. When exercised to modify, it does not destroy identity, but effects some change or qualification in form or qualities, powers or duties, purposes or objects, of the subject-matter to be modified, without touching the mode of creation. The word implies no power to create or to bring into existence, but only the power to change or vary in some particular an already created or legally existing thing. * * * The legislature may modify in various ways, by limiting or regulating their powers, duties, qualifications," etc. A fault is attributed to the law, that it is left to the will and caprice of the court or prosecuting attorney whether to pursue the one or the other method of prosecution, and therefore that its operation will not be equal and uniform ; that it will not affect all individuals alike, and therefore some may be deprived of the equal protection of the laws. This idea gained currency from the opinion in the case of *In re Lowrie*, 8 Colo. 499 (54 Am. Rep. 558), but that portion of the opinion is mere dictum, and has never been followed as authoritative, even by the court that announced it. Indeed, the indentical question, so far as the discretion of the court is concerned, was raised in the case of *In re Dolph*, 17 Colo. 35 (28 Pac. 470), and expressly determined contrary to the criticism. In the case of *In re Wright*, 3 Wyo. 748 (27 Pac. 565, 13 L. R. A. 748, 31 Am. St. Rep. 94)—a comparatively late case from Wyoming— it was suggested that it was a dangerous procedure to per-

mit a prosecution by information of the prosecuting officer alone, without preliminary examination before a magistrate, and the suggestion has since led to the amendment of the statute. But in a later case (*State* v. *Sureties of Krohne*, 4 Wyo. 347, 34 Pac. 3), in an opinion rendered by the same justice, such an act was held to be valid, and not obnoxious to the constitutional guaranty that no person shall be deprived of life, liberty, or property without due process of law. See, also, *Territory* v. *Stroud*, 6 Okl. 106 (50 Pac. 265).

Section 11 of the Bill of Rights, embraced by Article I of the Constitution of Oregon, has secured to the accused the right of public trial by an impartial jury ; to be heard by himself and counsel ; to demand the nature of the accusation against him, and to have a copy thereof ; to meet the witnesses face to face ; and to have compulsory process for requiring the attendance of witnesses in his favor. This constitutes the chief palladium of civil liberty under the constitution. The manner of preferring the accusation is of preliminary import, and whether it shall be done by a grand jury or by a public prosecutor, or concurrently by both, has, whether wisely or not, been left to the wisdom of the legislature to determine. Such is the authority reserved to it under the power to abolish or modify grand juries ; but it can never abridge the rights vouchsafed to every individual by the sacred and inestimable provisions of section 11 of the bill of rights, and in this is conserved to the accused very much of all there is of immunity from deprivation of life, liberty, or property without due process of law. He is entitled to bail, except he be guilty of murder or treason, and is protected against excessive bail and unnecessary rigor while in confinement. It may be a matter about which reasonable minds may differ, whether he should have a preliminary examination before being subjected to an accusation

and public trial before a court of justice, or as to the appropriate steps to be taken before an information may be preferred. But these matters are legislative in their import—made so necessarily, under the constitution, by virtue of the power given to modify grand juries; and, while the wisdom of the law may be a subject of dispute, the authority to enact it cannot be gainsaid.

3. At the close of the state's testimony the defendant moved for an instruction to the jury to return a verdict of not guilty, which being overruled, he again asked a similar instruction when the evidence on both sides was concluded. This request was also denied, and such action of the court is assigned as error. Thus is presented the question whether the evidence produced at the trial was. sufficient upon which to submit the case to the jury. It tended to show that the father of the defendant Harry Tucker lived about two miles from the residence of H. W. Lee, the alleged owner of the property taken; that Harry resided with his father; that Lee had in his granary on the night of January 30, 1899, seven sacks of alfalfa seed; that he locked the door of the granary at 9:30 o'clock in the evening by means of a padlock and heavy staple; that on the following morning he found the door had been opened and two sacks of the seed taken away. The staple appeared to have been broken from its fastenings by means of a punch secured from Lee's shop, some fifty feet distant. Tracks, apparently made by a person wearing boots with small, high heels, were traced to and from the shop, which was entered through a hole in the rear thereof, and the punch was bent, indicating its use. Other tracks, apparently made by the same person, were found leading to and from a gate in the barnyard fence to the granary, about twenty feet distant. From the gate the tracks of two horses were traced out through a field, thence into and along a road leading to a gate within two or three

hundred yards of the residence of the elder Tucker. Within about fifty yards of the gate by the granary, in the course of the horses' tracks, was found a letter, contained in a pocket, addressed to Harry Tucker ; and at the outlet from the field to the road were found tracks of a person, similar to those discovered at the granary. A. W. Gellis testified, in effect, that in the latter part of January or the first of February the defendant and Wilbur Fruit tried to sell some alfalfa seed to him in Baker City, which they said had been raised on Lower Powder ; that the boys gave their names ; and that he talked directly with the defendant, but did not see the seed. Charles F. Palmer testified, in effect, that the defendant and Wilbur Fruit came over to his store, in Baker City, on the evening of February 1, and talked with him concerning the sale of some alfalfa seed contained in two sacks, which he purchased from them the next morning ; that they said it was grown on Lower Powder, on the Fruit ranch. The sacks in which the seed was contained were positively identified as the property taken from his granary, and the seed was of the same character as that which he lost. The contention of the defendant is that there was no testimony connecting him with the commission of the crime of burglary, aside from the fact that the stolen property was recently found in the joint possession of himself and Wilbur Fruit, and that such possession was not sufficient to warrant the jury in drawing an inference of his guilt therefrom. The inference to be drawn from the possession of stolen property has been held by this court to be one of fact, which may be considered by the jury, in connection with all the other attending circumstances, in determining the guilt or innocence of the accused. Such inference is strong or weak according to the character of the property, the nature of the possession, and its proximity to the time of the theft : *State* v. *Pomeroy*, 30 Or. 16

(46 Pac. 797). Both of these parties were in possession of the seed, and both exercised ownership over it. The fact that such possession was not exclusive in the defendant could make but little, if any, difference in the weight of the circumstance, considered as as evidentiary fact.

The rule touching the inference to be drawn from the fact of possession is the same in cases of burglary as in larceny, where the latter crime has been committed in connection with the former : *State* v. *Rivers*, 68 Iowa, 611 (27 N. W. 781); *State* v. *Frahm*, 73 Iowa, 355 (35 N. W. 451). And it should be, as in cases of larceny, considered by the jury in connection with all the other inculpatory as well as exculpatory facts adduced at the trial, in determining the guilt or innocence of the accused. The question for us to determine is whether the testimony adduced is sufficient from which the jury may reasonably infer the guilt of the defendant. His possession is not the only item of evidence inculpating him. The fact of the horses' tracks, leading directly from the granary towards the residence of the father, where the defendant lived, and the further fact of the letter addressed to him being found in the route on the line of the tracks, are circumstances of some weight to be considered in connection with the circumstances of his possession, and the exercise of ownership over the stolen property: 1 McClain, Cr. Law, § 514. The property could not have been stolen or carried away without the breaking, so that the testimony pertinent to the establishment of the larceny was also relevant to substantiate the crime of burglary ; and, in our opinion, there was sufficient to go to the jury, and hence the request to instruct otherwise was rightly refused.

4. An exception was taken to the following instruction of the court : "Where two or more defendants are

36 OR.—20.

charged jointly with the commission of a crime, it is not necessary that it be shown that both of the defendants, or either one of them, when tried alone, actually broke and entered the building or took the property. · It is sufficient if it be shown that the joint defendants were acting together for that purpose, and if either one of them, while so acting together for that purpose, actually broke and entered the building with the intention of stealing therein, then all of the said defendants would be guilty of the crime, and either one of them may be prosecuted alone therefor.'' The ground of the exception is that there was no evidence introduced at the trial upon which to base the instruction touching the joint breaking. But in this the counsel are in error. The breaking was proven, and there was evidence tending to show that two persons were engaged in it. Further than this, the defendant and Wilbur Fruit were found associating together shortly afterwards, and jointly engaged in disposing of the fruits of the burglary.

An exception was taken, also, to the court's instruction No. 9. But what we have heretofore said upon the sufficiency of the testimony to go to the jury applies with equal force to this exception and instruction, so that it is unnecessary to discuss the matter further.

5. An exception was also saved to the court's refusal to give defendant's instruction No. 4. The effect of the instruction was given in the general charge, and no error can, therefore, be predicated upon the refusal. The judgment of the court below is affirmed.          AFFIRMED.