Argued June 29; affirmed July 26; rehearing denied
September 20, 1932

# STATE *v.* HATTREM

(13 P. (2d) 618)

372

*John F. Logan* and *Edwin E. Heckbert,* both of Portland, for appellant.

*Barnett H. Goldstein,* of Portland (Lotus L. Langley, District Attorney, and Ben H. Conn, Deputy District Attorney, both of Portland, on the brief), for the State.

CAMPBELL, J. The appellant was tried separately for the crime of larceny by embezzlement on a joint indictment charging that appellant and one W. E. Tyler, on February 14, 1928, did then and there, "knowingly and willfully and feloniously, embezzle and convert to their own use," personal property consisting of money, checks, bonds and corporation stock belonging to the Municipal Reserve and Bond Company.

The jury returned a verdict of guilty as charged, upon which judgment was entered. Appellant timely moved for a new trial which was overruled, and this appeal was taken.

The appellant was president and the owner of the majority of the voting stock of the Municipal Reserve and Bond Company. This corporation was organized in March, 1923, for the purpose of dealing in stocks and bonds and selling its own securities. Its articles of incorporation, as well as its by-laws, were amended from time to time, changing its capital structure. At the time of the alleged embezzlement, it had outstanding many shares of Class "A" Common Stock of no par value; $100,000 of Class "B" Common Stock divided into 3,500 shares of the par value of $50 each, the owners of which had the exclusive voting right and therefore control of the corporation; $225,000 of preferred stock, divided into 2,250 shares of the par value of $100 each. Of the Class "B" voting stock, appellant owned 1,980 shares giving him absolute control of the corporation.

The company had secured a permit from the corporation commissioner to sell 4,000 shares of its Class "A" Common Stock at $75 per share, and 1,500 shares of its own preferred stock at $100 per share. It was also authorized to sell $4,250,000, face value, of its sinking fund installment bonds. These installment bonds were to be secured by certain securities deposited with a trust company, which securities were not to be impaired or removed from the custody of the trust company without the consent of the corporation commissioner or by deposit of an equal amount in cash. At the time of the alleged embezzlement, there had accrued on the installment bonds sold a liability of $48,538.

The method by which the alleged embezzlement was accomplished was as follows: Appellant had one W. G. Bohn appointed as a committee of one to pass on and examine all applications for loans from the corporation. Defendant, W. E. Tyler, who had negotiated for

and agreed to buy all the stock of the company owned by appellant, made application for a loan from the company of $100,000. The application was referred to W. G. Bohn, the loan committee, and by him approved. Tyler thereupon executed his individual note in favor of the company. Instead of the company loaning Tyler $100,000 in cash, it loaned something over $3,000 in cash, or all the cash that it had on hand, and bonds, mortgages and checks and other securities, amounting in all to $75,025 claimed to be all the liquid assets of the company, and a purported balance of $20,825 due to the company from appellant on his purchase of stock. These securities and cash were not received by Tyler, but were turned over to appellant who thereupon transferred his stock to his codefendant.

The evidence shows that appellant conceived the plan, as outlined above, to secure for his own use all the liquid assets of the corporation. He presented the plan to a number of persons who were, or at some time had been, connected with the company; to Thomas A. Crowe, a former secretary of the corporation; to J. R. Armstrong, the then secretary; to Walter Johnson, a stock salesman; and to some others. None of these seemed sufficiently interested to take it up.

The testimony of Mr. Walter Johnson was that appellant approached him with a proposition of making a sale of the Municipal Reserve and Bond Company to him.

"Mr. Hattrem advised me that he was going to sell the company, that he had a buyer in sight, but did not divulge the name, he said that I knew the buyer whom it later developed that I did, and telling me that I being very intimately related with the company in many years of experience with the company would be the ideal man to purchase the company, knowing its operations and inner workings: I told him that I did not have any

money, nor would I be interested in the purchase of the company. He advised me that I did not need any money, and I don't remember just what the exact words were, but he me that inasmuch as I was,—that if I would consider the purchase of the company, he would show me a method by which I could buy it, so I asked him to explain the method. And he asked me if my father was in the city and I said that he was, and he says. 'You give me a note for consideration for $75,000, which by the way is $20,000 or $25,000 cheaper than I have offered it to this other man.' The consideration was to be $75,000, and if I would give him a note, and have my father sign the note, he would show me a method where I could gain control of that institution * * * in explanation, he offered me the following; he advised me to come to the office and make application for a loan from the company in the sum of $75,-000. He would take the application for the loan to his loan committee, and he would see that the loan was approved. Then I could come back the following day with the $75,000 and he would have his controlling stock ready, which was all of the Class 'B' Common Stock, and he would hand me the controlling stock indorsed to me in consideration of the $75,000 in cash which amount of money I had previously borrowed from them on the previous day. I told him that I did'nt think such a transaction would be legal, and advised him that before I made any move of that kind I would seek the advice of my lawyer, * * * It was further explained that after I got the stock in my possession, I would need to wait three days and call my board of directors together and then I could go through the pouch, it was in my keeping, and I could go through the pouch and take out my $75,000 note and do as I pleased with it * * * I questioned the legality of the transaction with him, yes * * * there was no money on my part required at all, the money of the company was to be loaned to me, that is what represented the $75,000 * * * and handed back to him for the stock * * * I was to take the note out of the pouch and destroy it * * * I brought up that

subject (of putting up collateral security) and that is where my father's signature was brought into the picture, I stated that my personal note was not worth $75,000 and my father's signature was suggested,— Mr. Hattrem also knew that I had considerable worthless stocks and he said if I wanted to please myself, I could attach any amount of the stock that I had to the note to satisfy myself.''

On cross-examination, he was asked:

''Q. Now, Mr. Johnson, what was your father worth at that time?

''A. Twelve or fifteen thousand dollars.

''Q. Didn't you make a statement to Mr. Hattrem, or did'nt Mr. Hattrem understand that your father was worth upwards of $100,000?

''A. No, sir.

''Q. You're sure about that?

''A. Yes, sir.''

The testimony of the others to whom the proposition to buy was made, is substantially to the same effect; that is, that any one who would agree to buy appellant's stock could make application to the company for the loan of the purchase price and he (appellant) would see that the loan would be granted and the money thus obtained would go to appellant for the stock and control of the company. The purchaser, then having control of the company, could do as he saw fit with the note or other muniment showing the indebtedness to the company.

There are twelve assignments of error.

1. Is based on the admission in evidence of the permits issued by the corporation commissioner to the Municipal Reserve and Bond Company.

2. Is based on the admission of the testimony regarding the number of stockholders in the company and the amount of their holdings and the amount of the bonds by the company.

3. Is based on the admission in evidence of state's exhibit No. 22, being a sample copy of the "sinking fund bond" issued by the company.

1. The offense of larceny by embezzlement can only be shown by a felonious intent in the conversion of the property alleged to have been appropriated: *State v. Marco,* 32 Or. 175 (50 Pac. 799).

2. On a prosecution for larceny by embezzlement, it is necessary to show that the property belonged to some one other than the person indicted: *State v. Stearns,* 28 Or. 262 (42 Pac. 615); *State v. Morgan,* 28 Or. 578 (42 Pac. 128).

█ It is relevant to show that the property embezzled belonged to the Municipal Reserve and Bond Company and that there were other stockholders besides the appellant. If the appellant was the sole owner of all the stock in the company of which he was president, no one else would be injured by any act on his part regarding the property; therefore, it was not improper to show that the corporation, of which appellant had absolute control, had been authorized by the state to buy and sell securities such as were the subject of the charge in the indictment; and also to show that there were other stockholders and persons who had an interest in the property of the company. It was proper to show, by the sample of the "sinking fund bond" issued by the company, that such a bond had been actually issued. This was simply another way of showing that besides the appellant there were others who had an interest in the assets of the company.

█ Four and five are based on the court permitting T. A. Crowe, a former director and secretary of the company, and H. E. Taylor, a former director, to testify as

to whether certain meetings of directors were held in the years 1926 and 1927, as shown by the minute book of said company.

In a case of embezzlement, it is necessary for the state to prove a criminal intent on the part of the persons charged. The statute declares as a disputable presumption that a person intends the natural consequences of his own acts: Oregon Code 1930, § 9-807. It is sometimes difficult to determine what are the natural consequences of certain acts. It is not possible to look into the mind of man and determine just what his intentions are at a particular time regarding certain of his acts. It was therefore proper for the state to show the attitude of the appellant towards the property of the company and his management of the corporation. The evidence of Coleman and Taylor tended to show a guilty intent on the part of the appellant. It tended to establish a series of acts of appellant in his dealings with the property of the company continuing to the time of the alleged embezzlement.

■ Six is based on the refusal of the court to permit appellant to introduce evidence showing the condition of the Municipal Reserve and Bond Company during the period of his management thereof. This evidence would simply go to show that under appellant's management, prior to the time of the embezzlement, the company waxed strong and healthy financially. Unfortunately for appellant, the law as it is at present makes no distinction between embezzlement from a prosperous corporation and one not so well off.

■ Seven is based on the refusal of the court to permit defendant to show by testimony that Tyler, his codefendant, was reputed to be financially worth upwards

of $100,000 at the time Tyler's note was substituted for the cash and bonds received by him and turned over to appellant.

There was no showing that the witnesses, called to give such testimony, ever communicated to appellant their knowledge of the reputed financial standing of Tyler. Appellant was permitted to testify, at great length, of his own knowledge of the financial reputation of his codefendant. If a servant, for his own benefit, loans to another, his master's money intrusted to his care, he should insist on security to support the borrower's promise to pay, more tangible than reputed wealth.

In some instances, the reputation of a bank for solvency may be given in evidence when it is material to the issue. Banking is a quasi-public business in which a great many people have a vital interest and its financial condition is much more closely watched than that of an individual in which the public may have no concern touching his financial standing.

"As a general rule, reputation is not admissible in evidence to establish the fact of a personal financial ability, but evidence of a general reputation of a person for financial responsibility, has been held to be relevant on the question of solvency." 10 R. C. L. 962.

Evidence of the reputed wealth of a defendant may sometimes be given in actions for damages: 8 R. C. L. 633.

■ Eight is based on the admission of the testimony of Ford E. Shaw in rebuttal concerning matters which appellant claims to be part of the state's case in chief.

In order to fully understand the nature of appellant's contention it must be kept in mind that appellant, as a witness in his own behalf, testified that the

transaction with his codefendant was an open business deal with an honest intent on his part, that he had consulted his attorneys, Mr. Handley and Mr. Sever, and was advised by them that his action in loaning the money to Tyler, his codefendant, was ''within the law.'' He tried to lessen the effect of the testimony of state's witness Coleman, who had given some damaging testimony against him, by testifying that there was a jealousy existing on the part of Coleman against Ford E. Shaw. Coleman had been employed to audit the books of the Municipal Reserve and Bond Company, and Shaw had been engaged by appellant to check the audit of Coleman, and protect the interest of appellant. Coleman, in his audit, reported irregularities in the bookkeeping system and in certain credits and debits on the books in favor of appellant. He also testified that he had told the appellant that the taking of certain credits was criminal.

On cross-examination, the appellant was asked (without objection) if he had not been advised by Shaw and Coleman and Mr. Handley and Mr. Sever, or by any of them, that it was criminal to take certain credits that had been taken by appellant on the books, and unless replaced he would be subject to criminal prosecution. To this question, appellant answered that he had not.

The substance of appellant's testimony while on the stand as a witness in his own behalf was to the effect that in all his dealings with the Municipal Reserve and Bond Company he did not intend in any way to financially injure the company, that his attorneys were consulted and that he had not been advised that any transaction he had had with the company was illegal.

For the purpose of contradicting this testimony, the state called, in rebuttal, Mr. Sever, who testified, in effect, that he and Mr. Handley had advisd appellant that the credits referred to in Mr. Coleman's audit were illegally credited to appellant. Mr. Handley testified to the same effect.

While Mr. Sever was testifying to the credit above referred to, he was asked:

"Q. What was finally said to him or said in his presence?

"A. It was told him that he would have to show evidence of the incorrectness of the account or he would have to pay the items.

"Q. Or what would happen?

\*      \*      \*      \*      \*

"Q. What did you hear Mr. Shaw say to him?

"A. Well, to put it plainly, 'You are guilty of embezzlement.'

"Q. That was in connection with this?

"A. $22,000."

No objection was made to these questions.

Later the state called Mr. Shaw, who testified, without objection, that appellant employed him to check the audit of Mr. Coleman, that he made the check and what he found; that his audit agreed with Mr. Coleman's as to the credits applied on appellant's indebtedness to the company. He was then asked:

"Q. Now what was the substance as to what you told Mr. Hattrem as to what you found in Mr. Coleman's report and what was the thing he said to you concerning it?

"A. Well, the substance of the,—that is rather difficult to express, I talked so many times to him, but the substance of it was that he was headed straight for penitentiary."

"Mr. Logan: I object to that."

It will be observed that no objection was made until the answer was given, and no motion was made to

strike the answer out. It is contended by counsel for appellant that the testimony regarding the auditing done by Mr. Shaw was developed for the first time in cross-examination of the appellant and therefore the state is bound by the answers made. When the appellant was on the stand, he testified at great length of his connection with, and his management of, the company. By so doing he opened up the subject and the state had a right to cross-examine on anything connected with the subject touched upon in direct examination, and if the answers to such cross-examination were unsatisfactory to the state, and it had witnesses who could and would contradict said testimony, it had a right to call such witnesses and introduce such testimony on rebuttal. The handling of the company's funds was not a collateral matter but the very thing under consideration. It was competent, for the purpose of showing the intent of the appellant in the transaction charged in the indictment, for the state to show a previous attempt on his part to convert the company's property to his own use by taking an unwarranted credit on the debt he owed; and that he was informed that such a taking was criminal. This could be done to rebut the testimony of appellant when he claimed to have acted on the advice of counsel and that he had not been informed by anyone that such an act was not "within the law." The instant case is easily distinguished from *State v. Minnick,* 54 Or. 94, (102 Pac. 605) ; *State v. Hunsaker,* 16 Or. 497 (19 Pac. 605) ; *State v. Evans,* 98 Or. 214 (192 Pac. 1062, 193 Pac. 927).

10. Nine is based on the refusal of the court to give the following instruction requested by defendant:

"You are instructed that the question of financial soundness of Mr. Tyler is a matter which may be in-

quired into by you for the purpose of showing the good or bad faith of the defendant, Hattrem. Reputation is one of the means of proving financial standing.''

The court in covering the matter in its instructions said:

''And you may also on this issue of the defendant's good or bad faith, inquire into the question of the financial soundness of Mr. Tyler, and also what the defendant believed Mr. Tyler's financial standing to be.''

The effect of the requested instruction was given: *State v. Tucker,* 36 Or. 291 (61 P. 894, 51 L. R. A. 246).

█ Ten is based on the following instruction given by the court:

''Now you should bear in mind that the defendant is on trial for the specific offense set forth in the indictment, and for nothing else and that you cannot convict him because he had done other things which are dishonest or unlawful. But evidence on these matters to which I have just referred is proper to be considered by you for the bearing it may have, if any, in your estimation, upon the question of the intent, or the good faith or the bad faith of the defendant, because in cases of this kind, it is sometimes necessary, in order to determine whether or not the accused is guilty, to look at the general course of conduct of defendant with respect to the subject matter of his trust, and all the facts and circumstances surrounding his act, which tend to throw light upon or illustrate its nature, and to draw such reasonable inferences therefrom as may be proper, respecting the intention and purpose of the defendant in acting as he did.''

This instruction is as favorable to appellant as the facts would justify. The jury was just as likely to conclude that the acts covered by this instruction merely showed carelessness as that they showed criminal intent. The instruction placed upon the jury the re-

sponsibility of deducing the correct inference as to whether criminal intent was or was not shown by the acts therein referred to.

■ Eleven is based on the court's instruction relative to aiding and abetting.

This particular instruction, when read in connection with the court's instructions as a whole, is not objectionable. The court fully instructed the jury of the necessary elements of larceny by embezzlement and that the state was obliged to prove every element beyond a reasonable doubt before appellant could be convicted.

The trial of a cause, either civil or criminal, is not a contest between counsel to determine which is the better versed in the rules of law, or the more adept in permitting only testimony favorable to the interest of their client to get to the jury; it is sufficient if the defendant has had a fair and impartial hearing; that no undue advantage has been taken of him by the admission of prejudicial testimony; that he was given a fair chance to present the facts pertinent and relevant to his defense and that the court justly interpreted the law applicable to the facts. This, we believe, was done in the instant case, therefore, it should be affirmed. It is so ordered.

ROSSMAN, J., not sitting.