STATE, Respondent, *v.* LAKE, Appellant.

(No. 7,314.)

(Submitted January 30, 1935.   Decided February 23, 1935.)

[43 Pac. (2d) 627.]

*Mr. W. F. O'Leary* and *Mr. H. R. Eickemeyer,* for Appellant, submitted a brief and argued the cause orally.

130

*Mr. Raymond T. Nagle,* Attorney General, *Mr. Jeremiah J. Lynch,* First Assistant Attorney General, *Mr. C. F. Holt,* County Attorney of Cascade County, and *Mr. J. P. Freeman,* Assistant County Attorney, for the State, submitted a brief; *Mr. Lynch* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

H. B. Lake was convicted of the crime of larceny as bailee in the district court of Cascade county. His motion for a new trial was denied. He appealed from the judgment of conviction.

The information charged in substance that on or about the thirtieth day of March, 1933, H. B. Lake & Co., a corporation, and the defendant H. B. Lake, as the servants, bailees and agents of one T. W. McDonald, had in their possession and custody $218.30, the property of McDonald, and that they did unlawfully, wrongfully, and feloniously appropriate such money to their own use, with the intent to deprive McDonald of his property and to appropriate the same to their own use.

H. B. Lake & Co. is a Montana corporation, formed for the purpose of engaging, as broker, in the business of buying, selling and dealing in stocks, bonds, other securities and grains. Most of the stock of the corporation was owned by H. B. Lake and members of his immediate family. Lake was president and managing director of the corporation. He was personally in active charge of the business, and all of the employees worked under his direction and obeyed his orders. The firm of Bartlett-Frazier & Co., of Chicago, was the eastern correspondent for the corporation, and at the time under consideration here, practically all stocks handled by Lake & Co. were bought and sold through that firm. The Lake Company maintained an account with the latter firm. There is some dispute as to the character of that account, but it is obvious that the account was in reality a marginal account in so far as Lake & Co. and Bartlett-Frazier & Co. were directly concerned.

On March 27, 1933, McDonald entered the offices of Lake & Co. at Great Falls, and through the floor man gave an order to purchase outright for him fifty shares of American Power & Light stock at 4⅛ dollars per share. The order was immediately transmitted to Bartlett-Frazier & Co., and that company purchased the stock as ordered. The next day Mc-

Donald was informed that the order had been filled. Thereupon he went immediately to the office of Lake & Co. and drew a check in its favor for $218.30. This was the total purchase price of the stock, including commissions, taxes and wire service. The check was delivered to Gertrude McGrath, cashier for Lake & Co., together with instructions to order the stock out in his name. The check was drawn upon a Great Falls bank and deposited to the credit of Lake & Co., and was paid in full in the regular course of business. The money remained in the bank, where it was subject to the check and use of Lake & Co. The stock was actually bought through a New York broker on request of Bartlett-Frazier & Co., and was charged on their books to Lake & Co.

On April 12, 1933, Lake & Co. made an assignment for the benefit of creditors and ceased doing business. At that time no transmittal order or order directing the stock out of the hands of Bartlett-Frazier & Co. had ever been sent by Lake & Co. to that company. Subsequently Lake & Co. was adjudged a bankrupt and its business and affairs were placed in the hands of a trustee in bankruptcy. McDonald filed a reclamation claim with the trustee, claiming fifty shares of American Power & Light stock in the hands of Bartlett-Frazier & Co. at the time Lake & Co. suspended. In due course McDonald received $73.62 as his proportionate share of the moneys received from the sale of all American Power & Light stock in the possession of Bartlett-Frazier & Co. to the credit of Lake & Co. at the time of the Lake failure. It developed that instead of having enough American Power & Light stock ordered from Bartlett-Frazier & Co. to satisfy the demands of all who had ordered and paid for it, the account was actually short. Lake & Co. had orders for 175 shares, but Bartlett-Frazier & Co. only held $129^{35}/_{50}$ shares in the Lake account.

It appears from the evidence that at about the same time when McDonald placed his order for the American Power & Light stock, other persons had placed orders for stock under similar circumstances and had likewise paid for the stocks and directed that they be ordered out and delivered in due

course. In spite of such directions, Lake & Co. never sent transmittal orders to Bartlett-Frazier & Co. ordering out such stock. Most of these customers, like McDonald, filed reclamation claims with the trustee in bankruptcy. This accounted for the short payment to McDonald.

The evidence adduced by the prosecution tended to establish the following facts: It was customary and necessary that Lake & Co. should maintain a certain marginal or credit balance with Bartlett-Frazier & Co. at all times. This marginal account could not be reduced beyond a certain point. When the account reached such minimum point, Bartlett-Frazier & Co. refused to release any more stocks to Lake & Co. for its customers unless the latter company sent a draft along with the transmittal order. From January 1, 1933, until it closed its doors, Lake & Co. was financially embarrassed. Stocks were not ordered out and delivered to customers in regular rotation; only the most insistent of its customers were able to obtain their certificates within a reasonable time. Those who were complaisant about the matter were obliged to wait indefinitely. This situation existed by reason of the condition of the marginal account with Bartlett-Frazier & Co. In order for Lake & Co. to order out and receive the stock which McDonald and others had purchased and paid for, it became necessary that the transmittal orders be accompanied by a draft for the purchase price of the stock ordered out, or that the account with Bartlett-Frazier & Co. be otherwise supplemented. The Lake Company did not have sufficient money or credit to order out all of the stock which McDonald and the other customers had purchased, paid for, and ordered out.

Evidence was adduced to show that a day or two before Lake & Co. closed its doors, the situation was such that if it had ordered out all of the stocks which it had sold and for which it had received payment, it would have lacked something like $27,000 in its Bartlett-Frazier & Co. account to make this possible. The transactions in American Power & Light stock are illustrative of the fact that Lake & Co. did not have enough stock with Bartlett-Frazier & Co. to meet the requirements of

customers who had purchased stock outright, or at least thought they had done so. Transmittal orders were made out in due course, but, instead of sending them in the regular order, the defendant H. B. Lake examined them every day as they were written up and selected certain ones that should go forward to Bartlett-Frazier & Co. This, the state contends, was because there was not sufficient money or credit in the account to warrant sending them all in. However, neither Lake nor his employees ever informed any of the customers of the firm of the condition or the practice in that respect.

The defendant introduced evidence tending to show that McDonald never at any time made a demand or request for the return of the money which he had paid to Lake & Co. It was contended that if he had done so at any time prior to the suspension of the company, the money would have been returned to him. Defendant contended that at all times from the twenty-eighth day of March until suspension it had to its credit with Bartlett-Frazier & Co. more than fifty shares of American Power & Light stock, that is, more than the amount ordered by McDonald; that at all times between March 28 and the date of suspension it had more than $218.30 (the amount paid by McDonald to it) on deposit in each of the three banks with which it did business in Great Falls. He likewise contends that in filing his claim with the trustee in bankruptcy, McDonald claimed the stock instead of the money; that he could not be the owner of the stock and the money at the same time; that it was the intent of the defendant that the stock ordered by McDonald would be ordered out, and that there was no intent on his part to steal any money or stock from McDonald; that Lake & Co. at all times covered by the transaction had approximately $17,000 in cash and securities in the hands of Bartlett-Frazier & Co. over and above its indebtedness to that firm. All of these facts were introduced in an attempt to show that there was neither necessity nor a design on the part of Lake & Co. to deprive McDonald of the stock or the money.

Defendant has assigned seventeen specifications of error, but in the argument thereof has grouped and discussed some of them together. It will not be necessary for us to discuss all of them, and we will therefore give attention to the more important ones.

The first specification attacks the sufficiency of the information, and it is asserted that the court erred in overruling defendant's demurrer thereto. It is argued that the pleading does not state a public offense, and does not contain a statement of facts constituting the offense charged, in such manner as to enable a person of ordinary understanding to know what is intended, as required by section 11843, Revised Codes 1921.

The information, after alleging the corporate capacity of Lake & Co. and the official position of defendant therewith, charges that on or about the twenty-eighth day of November, 1933, the corporation and the defendant and each of them, being then and there the agents, servants and bailees of one T. W. McDonald, came into the possession, custody and control of certain personal property owned by McDonald, $218.30, and that H. B. Lake & Co. and the defendant did thereafter, as such bailees, unlawfully, wrongfully and feloniously appropriate the said money to their own use, etc.

Obviously, the information was drawn under the provisions of subdivision 2, section 11368, Revised Codes 1921. The charge is that of larceny as agents, servants, and bailees, and is in the words of the statute. The information generally follows the statute, and we think it is good. An information which charges the offense of larceny as agent or bailee in the language of the statute is sufficient and is not vulnerable to a general demurrer. (*State* v. *Brown,* 38 Mont. 309, 99 Pac. 954; *People* v. *Riccardi,* 50 Cal. App. 427, 195 Pac. 448; *Connelly* v. *State,* 93 Tex. Cr. 295, 248 S. W. 340.) The information was sufficient, and the court was correct in overruling the demurrer.

Defendant asserts that the court erred in its ruling limiting the purpose of his Exhibit A, which was the petition of McDonald for reclamation made to the trustee in bankruptcy.

In this petition McDonald attempted to reclaim the fifty shares of American Power & Light which he had ordered out. He asserted that he had title to the stock and demanded the return thereof or its market value at the time it was sold after Lake & Co. closed its doors. The limitation placed by the court upon the purpose for which the exhibit was admitted is to be found in one of the instructions to the jury (No. 16). It is not necessary to quote the instruction here, because it was apparently given with defendant's consent. The record does not show any objection or exception thereto. Under such circumstances defendant cannot now be heard to say that the court was in error in placing such limitation upon the exhibit and the purpose for which it was received.

Error is assigned on account of the admission in evidence, over defendant's objection, of exhibits designated "KK16" and "K7." These exhibits were compilations taken from the books of Lake & Co. They showed the condition of the account with customers who had paid for their stocks in full and were entitled to their certificates. Defendant argues that this evidence was immaterial and irrelevant, that it threw no light on the charge involved, and that it did not in any way tend to prove the larceny of the money charged to have been taken. We are unable to agree with this contention. Prior to the offer of the compilations, testimony had been adduced as to separate transactions between other customers and Lake & Co. These were admitted to show system and intent. The exhibits in question were introduced to show the business practices and the state of the account. They showed particularly that there were other customers in the same situation as McDonald, and that it would not have been possible for Lake & Co. to take care of all of its customers similarly situated, in view of the state of the account with Bartlett-Frazier & Co. (*State* v. *Cooke*, 130 Or. 552, 278 Pac. 936; *State* v. *Monahan*, 50 Nev. 27, 249 Pac. 566; *State* v. *White*, 46 Idaho, 124, 268 Pac. 415; *State* v. *Judd*, 74 Utah, 398, 279 Pac. 953; 2 Nichols on Applied Evidence, p. 1919, sec. 40.)

Defendant argues that the above exhibits included many ▮ stocks ordered by customers on margin. The fact that some of the stocks had been originally purchased on margin is not impressive or controlling. When a customer having a marginal transaction with his broker pays in full for the stock, he is entitled to its delivery. The account then ceases to be marginal. (*Edwards* v. *Jenkins*, 214 Cal. 713, 7 Pac. (2d) 702; Meyer on the Law of Stockholders, 312–317; 9 C. J. 543.)

Under specifications of error numbered 8, 9, 10 and 11, de-▮ fendant contends that the court erred in sustaining objections to certain questions propounded by his counsel. The information sought to be elicited by these questions had to do with the net worth of Lake & Co. at the time it closed its doors. As illustrative of the questions thus asked and to which objection was sustained, a witness was asked if the assets of Lake & Co., including the money in the banks, the money and securities with Bartlett-Frazier Co., the houses and ranches owned by Lake and the Lake Company, and the Lake Grain Company, were sufficient to pay for all of the stock that was ordered out by customers of Lake & Co. Obviously, the purpose sought to be accomplished by the above line of testimony was to establish the likelihood that there was no appropriation, or attempt to appropriate, McDonald's money, and that there was no intent to commit the crime. In other words, the testimony was evidently based upon the premise that if the defendant had a large amount of assets he could not be guilty, or was not likely to be guilty, of intentionally converting McDonald's money. The theory upon which this line of testimony was offered is unsound. It has been frequently held by courts in many jurisdictions that in a prosecution for embezzlement, proof of the financial worth of the accused and his ability to meet his obligations should be excluded. (*Doxen* v. *State*, 151 Md. 118, 134 Atl. 166; *State* v. *MacCullough*, 115 Conn. 306, 161 Atl. 512; *Masters* v. *United States*, 42 App. D. C. 350, Ann. Cas. 1916A, 1243; *State* v. *Hattrem*, 140 Or. 371, 13 Pac. (2d) 618.) The court was correct in rejecting such evidence. We are fortified in this conclusion by the fact disclosed in

the record that, in spite of the objections to specific questions, defendant did finally succeed in getting practically all of this evidence before the jury. Under the circumstances he suffered no prejudice.

Error is predicated upon the court's refusal to give defendant's proposed instruction No. 1, which is as follows: "You are instructed to find the defendant not guilty." In this connection we may also consider the alleged error of the court in refusing to grant defendant's motion for a directed verdict.

Defendant argues that the state failed to prove that defendant or Lake & Co. ever committed larceny of any money or stock belonging to McDonald, as charged in the information; that there was no evidence that he personally, as an individual, ever had in his possession any money belonging to McDonald; that there was a failure of proof to establish any intent on the part of Lake & Co. or defendant to steal or misappropriate the money or stock of McDonald. Defendant also contends that the evidence affirmatively shows that he and Lake & Co. were not agents or bailees in possession of McDonald's money; on the contrary, he claims that the relation of debtor and creditor existed between themselves and McDonald. All of the questions herein presented were asserted and considered in the case of *People* v. *Meadows,* 199 N. Y. 1, 92 N. E. 128, 129. It is one of the leading cases on this subject and is practically identical in its important phases to this case. There the defendant Meadows was a member of a brokerage firm. He was the active member in charge of the business. One Silverthorne, a customer, came to the office and instructed defendant to purchase 700 shares of a certain stock for him at a named price. Defendant ordered his New York correspondent (Post & Flagg) to purchase the stock upon the New York Exchange. The next day defendant sent Silverthorne a memorandum to the effect that his firm had bought the stock for him. Silverthorne thereupon mailed to defendant his check for the amount of the stock. The check was deposited to the general account of the firm. The stock was

never ordered out from Post & Flagg, although Silverthorne had directed defendant to do so. Thereafter defendant's firm became bankrupt. The defendant was convicted of embezzlement of Silverthorne's money. It was claimed by defendant Meadows, just as it is claimed here, that there was no evidence to establish a criminal intent in the defendant. The language of the New York court in disposing of that contention is peculiarly pertinent and applicable: "Where the offense consists in the appropriation by an agent, bailee, a trustee, or an attorney, of the property of the owner, the felonious intent need only exist at the time of the appropriation; for, in such a case, the property stolen would have been properly in the possession of the defendant. * * * The criminal act in this case was committed, and the criminal intent evidenced, when, departing from his duty to use the moneys in paying for the stock, the defendant diverted it to other purposes. Evidence of a criminal intent to defraud Silverthorne of his property was not wanting. The firm was heavily involved, the pressure of debt very great, and the bank balance very low. The jurors were warranted in inferring that the defendant yielded to the temptation of relieving the pressure by diverting the funds received from Silverthorne to his own purposes, hoping, if not believing, that, during the latter's absence from the country, an opportunity might be afforded for restoration. A deliberate diversion of the moneys being shown, it required but slight evidence in the facts and circumstances to satisfy the jurors as to the existence of the felonious, or criminal, intent. His expectation or intention of restoring the moneys so diverted, of course, was of no avail."

In this case, the evidence shows a diversion of McDonald's money. We think there was clearly a sufficient showing made upon which the jury was warranted in finding that the defendant in so diverting McDonald's money yielded to the temptation of relieving the financial pressure under which Lake & Co. was then laboring.

Defendant vigorously asserts that this case is distinguishable from the *Meadows Case,* and that the latter case is not in point here. He claims that in the *Meadows Case* the defendant broker (Meadows) ordered the stock from its correspondent (Post & Flagg) upon margin, and that here Lake & Co. bought the stock outright as directed, and not on margin. We find no merit in this contention. The business arrangement existing between the Meadows firm and its New York correspondent was to all intents and purposes identical to the arrangement disclosed by the evidence here to have existed between Lake & Co. and its eastern correspondent, Bartlett-Frazier & Co. The evidence here shows that Lake & Co. had a marginal account with Bartlett-Frazier & Co. The testimony of James P. Wade, secretary of the latter company, and of the defendant Lake himself, disclosed the actual facts as to the account between the two firms. After explaining the matter quite fully, and at the conclusion of his testimony, Wade finally explained the McDonald transaction. He said that until McDonald's stock was ordered out, which, however, never occurred, it was still subject to the lien of Bartlett-Frazier & Co. for the amount owing to it by Lake & Co. He was asked the following question: "And if a customer comes in and pays his stock up in full, and if the account of H. B. Lake & Co. would be in such shape they couldn't get it released from your lien unless they sent a draft along with it, they would still be duty bound to do that, would they not?" An objection was made to this question, and the matter was argued. Wade finally said: "The only way I can answer that is we would release the stock at any time which would not impair the marginal status of H. B. Lake & Co." There we have an explanation by Bartlett-Frazier & Co. of the account with Lake & Co.

Mr. Lake was examined specifically as to the whole matter. He finally summarized by saying: "After that stock is paid for for Mr. McDonald with cash belonging to H. B. Lake & Co., we then have a lien upon that particular 50 shares of American Power & Light until Mr. McDonald comes in and pays us, and the check is cleared. That stock is Mr. McDon-

ald's and we keep that stock as a pledge and keep our lien upon that stock until he pays for it. Bartlett-Frazier in turn keep a lien on all securities we have down there until we order them out, and this particular stock of Mr. McDonald's was kept at Bartlett & Frazier, together with any other securities we might have had up there until we ordered it out."
When pressed as to the reasons for not ordering out the McDonald stock, Mr. Lake said that he was trying to raise money to keep his business functioning so everybody could get their stock, and that he wanted to order everybody's stock out; that is, everybody who had paid in full. He said that if McDonald's stock was paid for in full, he was entitled to receive it.

It is therefore obvious that the relation between Bartlett-Frazier & Co. and Lake & Co. constituted a marginal condition. The mere fact that Bartlett-Frazier & Co. had to pay in full for stocks such as the American Power & Light stock, selling under $10, did not alter the situation. It merely meant that the full purchase price was charged by that company against Lake & Co. on the account, and there the matter was allowed to rest. That is exactly what was done in the *Meadows Case.* The situation here would have been different if Lake & Co. had not withheld the order out instruction. The result of the failure to give that order first left the American Power & Light stock subject to the lien of Bartlett-Frazier & Co. and later caused the sale of the stock by that firm. All of this occurred through the failure of Lake & Co. to follow the instructions given by McDonald. The authorities quite uniformly hold with the *Meadows Case* in this particular. (See *State* v. *Cooke,* supra; *State* v. *Monahan,* supra.) In the cases just cited the facts involved were very similar to those presented here. In both of them the courts adverted to and followed the decision in the *Meadows Case,* and upon evidence very similar to that adduced in this case held that there was a sufficient showing to warrant the jury in finding the defendant guilty of the crime of larceny. (See, also, *People* v. *Too-*

*hill,* 208 App. Div. 174, 203 N. Y. Supp. 457; Meyer on the Law of Stockbrokers, 681, sec. 183.)

The defendant contends that the relationship existing between McDonald and Lake & Co. was that of debtor and creditor, rather than principal and agent or bailee. The same contention was advanced in the *Meadows Case.* The New York court, in discussing the question, said: "The argument that the relation of debtor and creditor existed is quite untenable. Not only did the defendant's firm have no funds to the credit of Silverthorne in general account at the time, but the verdict establishes the truth of his evidence that he intrusted the moneys in question to them for the specific purpose of paying for the stocks he had ordered to be bought and of causing their transfer into his name. The answer to the appellant's argument that the title to the stocks was in Silverthorne and that the relation of pledgor and pledgee existed between him and appellant's firm is that the verdict has established the fact to be that immediately upon being notified of his order having been executed he remitted the amount representing the cost of the stocks. He had no general account with the firm. His check went to discharge his whole liability, and if the moneys had been faithfully forwarded to New York, as the defendant was bound to do, the title to the stocks would have been perfected in him."

Defendant cites and relies upon several cases wherein it is held that a broker, who acts as agent in purchasing stock for a customer, becomes a creditor in advancing money for the purchase, and thereafter holds the stock as a pledgee; that a broker's purchase of stock for the customer, and notification to him, passes title notwithstanding nondelivery of certificates. None of these cases are in point here; practically all of them are civil cases. While the rules contended for may be properly applicable in civil actions, it is quite generally held in criminal prosecutions, such as the instant case, that the relation of debtor and creditor or pledgee does not exist after the customer has paid for his stock, as McDonald did in this case. (See *People* v. *Meadows,* supra; *State* v. *Monahan,* supra;

*State* v. *Cooke,* supra.)   In executing an order for the purchase or sale of stock, the relationship between the broker and his customer is that of principal and agent.   (Meyer on the Law of Stockbrokers, p. 249, sec. 39; 9 C. J. 510; 4 R. C. L. 242, and cases cited.)

Defendant places considerable emphasis upon the fact that ■ McDonald filed a claim in the bankruptcy court and received back a part of his money.   We are of the opinion that this matter is of no importance in the consideration of this case.   If the defendant committed the crime of larceny on or about March 30, 1933, in the manner and form as alleged in the information, then what McDonald did thereafter in an effort to regain his property is of no consequence in this action.   McDonald could not by his conduct in this respect bind the state of Montana.   (*People* v. *Paddock,* 300 Ill. 590, 133 N. E. 240; 1 Wharton's Criminal Law, secs. 192, 385.)

The fact that McDonald never made any demand upon de- ■ fendant to return the money is immaterial.   In a case such as this there need be no allegation or proof of a demand upon the defendant to return the money.   (*Milbrath* v. *State,* 138 Wis. 354, 120 N. W. 252, 131 Am. St. Rep. 1012; *Commonwealth* v. *Duvall,* 220 Ky. 771, 295 S. W. 1047; *People* v. *Indrieri,* 75 Cal. App. 672, 243 Pac. 476; *State* v. *White,* supra.)

McDonald never had any notice that his directions were not being followed.   There was nothing to make him believe that it was necessary for him to demand the money back, instead of the stock.   There is nothing in the record to show that he had any notice that Lake & Co. was not proceeding to carry out the transaction or that it was not able to do so.   Therefore, it is not reasonable to say that he should have gone into the Lake & Co. offices and demanded the return of his money, which in effect would have been a rescission of the whole transaction.   Without any notice of any kind that Lake & Co. had failed to order the stock out or would be unable to fulfill its contract, he could not be expected to back up and try to avail himself of some other means of saving his money.   It

was not the money he was after; it was the stock he had purchased he was entitled to receive; and this he did not get because Lake & Co. failed and refused to do everything incumbent upon it to get it for him.

Finally, error is predicated upon the court's refusal to give certain instructions offered by defendant. Most of these instructions were based upon the contentions advanced by defendant which have already been considered herein at considerable length. We have pointed out the fallacy and error of these contentions and the premises upon which they are based. It follows, of course, that any instructions based upon such false and erroneous propositions could not properly be given. We find that all of the instructions offered by defendant and refused, either were erroneous or, if not erroneous, the subject matter thereof was contained in others given by the court. Under such circumstances it cannot be said that defendant suffered any prejudice from the court's refusal to give the instructions in question.

After a careful study and consideration of the entire record in this case, we are convinced that there has been no reversible error committed.

The judgment is therefore affirmed.

MR. CHIEF JUSTICE SANDS, ASSOCIATE JUSTICES MATTHEWS and ANDERSON, and HONORABLE GEORGE W. PADBURY, Jr., District Judge, sitting in place of MR. JUSTICE MORRIS, disqualified, concur.